UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ROSIE M. PORTIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-252 PS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Rosie Portis has appealed the final decision of Defendant Commissioner of Social Security Administration ("SSA") denying, for lack of disability, her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Portis proceeded *pro se* at her administrative hearing yet the parties agree that her waiver of counsel was invalid. On appeal, Portis argues that the Administrative Law Judge ("ALJ") who presided over her hearing breached his obligation to develop a full and fair record and this breach resulted in an evidentiary gap that prejudiced Portis' claim. In addition, Portis argues that the ALJ failed to address significant evidence that conflicted with his findings and did not consider all of Portis' impairments at steps two, three, and four of his inquiry. Because the SSA has not met its burden to demonstrate that the ALJ developed a full and fair record without prejudice to Portis, this case is remanded for further inquiry and evaluation consistent with this opinion.

# I. BACKGROUND

At the time of her hearing in September 2004, Rosie Portis was a 60 year-old woman with a high school degree and four years of automotive repair training from a technical college. (R. at 70, 204-5.) Her past work experience includes employment as a supervisor/sales clerk at a department store, a sales clerk/cashier/stock clerk at a retail store, and a newspaper carrier. (R. at 15, 65, 81-88.) Portis reported to the SSA that back, leg, and ankle pain limited her ability to work. (R. at 52, 64.) On her applications for Disability Insurance Benefits and Supplemental Security Income, Portis claimed that she became unable to work on June 10, 2002. (R. at 52, 160.) She testified at her administrative hearing that she has not been able to hold down a regular job since 1998. (R. at 214-6.)

## A. Procedural History

On December 4, 2002, Portis filed claims for Disability Insurance Benefits and Supplemental Security Income Benefits. (R. at 52-4, 160-2.) After her claims were denied initially and upon reconsideration, Portis requested a hearing before an ALJ. (R. at 33.) ALJ William Wilkin held a hearing on September 2, 2004 (R. at 197-240) and issued a decision on November 15, 2004. (R. at 11-2.) The ALJ determined that Portis is not disabled within the meaning of the Social Security Act. After the Appeals Council denied Portis' request for review of the ALJ's decision, Portis filed this action. Pursuant to 42 U.S.C. § 405(g), Portis seeks review of the ALJ's decision, which now stands as the final decision of the SSA.

## B. Administrative Hearing

### 1. *Plaintiff's Waiver of Counsel*

On September 2, 2004, the ALJ presided over Portis' hearing. (R. at 197-240.) Portis personally appeared and testified at the hearing. (R. at 196, 203-34.) Before the hearing, the ALJ provided Portis written notice of her opportunity to be represented by counsel. (R. at 39.)

The ALJ also discussed her right to representation with Portis before she began her testimony (R. at 199), but Portis expressed an intention to proceed unassisted by counsel (R. at 50, 199.). Before he accepted Portis' waiver, the ALJ stated: "The only thing that I have to do is I have to make sure that you have the mental capacity to make that decision for yourself." (R. at 199.) Satisfied that Portis possessed the requisite mental capacity, the ALJ accepted the waiver of her right to be represented by counsel. (R. at 199.)

### 2.  *Portis' Testimony*

Portis testified that she worked as a cashier at T. J. Maxx from 1991 until 1998 when she fell while on the job. (R. at 207, 215.) Portis explained that she was fired from T.J. Maxx after her 1998 fall because she could no longer do the job. (R. at 215-16.) Portis stated she has had problems with her legs and back ever since she left T.J. Maxx. *Id*. Portis reported that she received $4,000 in workers' compensation following her fall at T.J. Maxx. (R. at 217-18.)

Portis stated that she has not been able to hold down a regular job because she cannot stand on her feet. (R. at 214-15.) Portis testified that her ankles, back, and wrists "hurt constantly" and that she takes Ibuprofen daily to address her constant pain. (R. at 218.) She testified that she takes Ibuprofen every four hours, and it stops the pain enough so that she can function. (R. at 219.) Portis also reported using an inhaler when she has problems with her asthma and taking medication for muscle spasms in her back and an herbal remedy for her kidney problem. (R. at 219-20.)

When asked about her medical history, Portis testified that Dr. Carey is her family physician, that she has seen him since the 1960s, and that she last saw him the week prior to the hearing. (R. at 223.) She also reported seeing a chiropractor, Dr. Kawecki, and receiving treatment twice per week to get her hip "back in shape" and to get back on her feet. (R. at 224-25.) The ALJ reported that he would seek updated records from Drs. Carey and Kawecki. (R. at

223-24.)  In reference to x-rays taken in August 2003, the ALJ reported, "we'll try to get the records up to date and so forth so that we know what we're talking about here."  (R. at 226.)

Portis testified that the farthest she walks is from the door of her home to her car and that she drives only as far as the corner store.  (R. at 225, 230.)  She stated that she had not been to church in the last three months, that she does not visit with neighbors, friends, or relatives, that her daughter has been grocery shopping and cooking her meals, that she has no hobbies, and that she cannot do yard work "because of her back."  (R. at 225-27.)  Portis demonstrated to the ALJ that she could make a fist and reported that she uses a spoon to drink her coffee because her hands and wrists "hurt constantly."  (R. at 228.)  Portis, however, later testified that she can lift a half-gallon carton of milk with both hands.  (R. at 231.)  Portis demonstrated to the ALJ an ability to "extend her arms parallel to the table in a seated position without complaint."  *Id.*  Portis reported that she could stand for five minutes before her legs cramped so badly that she would have to sit down.  (R. at 229.)  She testified that she can sit for fifteen or twenty minutes but prefers to lay down on her side.  (R. at 229-30.)

Portis reported no vision or hearing problems and testified that she understood everything that the ALJ had said.  (R. at 232.)  When the ALJ asked about her memory, Portis responded that she forgets where she is when she bends over and thinks that she is "having the Alzheimer's disease."  *Id.*  Portis informed the ALJ that she is not being treated by a psychiatrist or psychologist, and the ALJ made no further inquiry.  *Id.*

At the end of his examination of Portis, the ALJ again discussed obtaining additional medical records, saying:

> ALJ: ...We're going to make a request, I guess, for the most recent hospitalization, or emergency room visit you had there from your fall.
>
> PORTIS:  That's Community Hospital.

>ALJ: And then also from that, for that–the doctor that–either the chiropractor or somebody else...here.
>
>PORTIS: Yeah, chiropractor.
>
>ALJ: Because I don't, I don't know what your physical situation is. I might even have to have an examination. I know we had you examined I guess back in August of 2003...

After the hearing, the ALJ attempted to obtain the hospital records relating to Portis' fall in 2004. However, it appears that he requested them from the wrong hospital. Although Portis testified that she was treated at Community Hospital, the ALJ apparently sent the records request to Methodist Hospital. (R. at 17) ("In an attempt to update the claimant's medical file, I requested updated records from Dr. Carey and Methodist Hospital post-hearing .... Methodist Hospital advised that there are no records pertaining to the claimant for 2004.").

### C. The ALJ's Decision

The ALJ noted that Portis personally appeared and testified, "after being apprised of her right to and benefits of counsel, but electing to proceed without representation." (R. at 14.) The ALJ reported "all documents contained and marked in the claims files as exhibits (were admitted) into evidence at the hearing." (R. at 14, 200-2.) At the close of the hearing, the ALJ declared that the record would remain open until October 5, 2004 while the ALJ obtained additional records. (R. at 239-40.) In addition to bringing her medical records up to date, the ALJ informed Portis that he would send copies of the record to her so that she would know what is in her file and he would determine whether he needed any additional information. (R. at 239.) The ALJ then closed the hearing, forty minutes after it began. (R. at 240.)

The record includes an *Examination of Post Hearing Evidence* form dated October 15, 2004 that lists three additional exhibits entered into evidence. (R. at 51.) The form is not signed

by Portis nor does it indicate that Portis failed to respond to the notice within 10 days. *Id.* Nonetheless, the ALJ noted in his decision that "[a]ll available evidence has now been received, and proffered to the claimant for review and comment, so the record is closed." (R. at 14.) Ultimately, the ALJ concluded that Portis met the nondisability requirements in Section 216(I) of the Social Security Act, was insured for disability benefits through the date of the ALJ's decision (R. at 15), but was not disabled within the meaning of the Social Security Act. (R. at 14.)

The ALJ applied the five-step test to determine whether a claimant is disabled. *See* 20 CFR §§ 404.1520 and 416.920; *see infra* at 14. First, the ALJ found, based upon Portis' sporadic work as a newspaper carrier, limited income, and the absence of contradictory evidence, that Portis had not engaged in any substantial gainful activity since she alleged that she became disabled. (R. at 15.) Second, the ALJ found that Portis has asthma, obesity, and degenerative joint and disc disease of the lumbar spine, and "the impairments are 'severe' within the meaning of the Regulations." (R. at 17.) The ALJ reached this conclusion upon reviewing medical records from Dr. Komyatte, Dr. Bautista, Portis' pulmonary function test, Dr. Carey, Dr. Mahawar and Methodist Hospital, discharge papers from Community Hospital, and Portis' testimony at the hearing. (R. at 16-17.) Third, although the ALJ found Portis' impairments to be "severe," he agreed with the State Agency medical consultants that Portis' impairments, alone or in combination, did not meet or equal the criteria for Portis to be presumed disabled without further inquiry. (R. at 16.) Fourth, in determining whether Portis retained the residual functioning capacity ("RFC") to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy, the ALJ found that Portis' "complaints of physical pain and limitations were disproportionate to the clinical signs and laboratory findings of record" and, consequently, found her not wholly credible. (R. at 17.) Based upon Portis' testimony, evidence in the record, his conclusion regarding Portis' RFC, and

the vocational expert's testimony, the ALJ found that Portis could perform her "past relevant work" as a cashier. (R. at 18.) Therefore, the ALJ found Portis not to be disabled as defined by the Social Security Act. 20 CFR §§ 404.1520(f) and 416.920(f).

### D. Medical Evidence Not Included in the Record

#### *1. Dr. Narcisi's Records*

On October 9, 2003, Portis informed the SSA that she sought treatment from Dr. Frank Narcisi in April 2003 for ankle pain. (R. at 102.) No records from Dr. Narcisi were made part of the record in this case. Portis submitted records from Dr. Narcisi as an appendix (Pl.'s Mem. App. at 1-25) to her Memorandum filed with this Court. (DE 19.) Dr. Narcisi's records include progress notes between November 21, 1996 and June 21, 2002 (Pl.'s Mem. at 1-10), three *Duty Status Exams* completed by Dr. Narcisi between November 1996 and January 1997 (*Id.* at 22-24), a letter written by Dr. Narcisi on April 3, 1998 explaining Portis' foot condition (*Id.* at 20), and a *Medical Impairment Evaluation* completed by Dr. Narcisi in August 1998 (*Id.* at 15-19).

Dr. Narcisi's progress notes reveal treatment for chronic bilateral inflammation in the ankles and Pes Planus. *Id.* at 1-10. Dr. Narcisi concluded that surgical correction was unavailable and recommended arch supports and Ibuprofen as treatment. *Id.* The progress notes reveal that Portis reported periods of improvement followed by periods of increased pain and discomfort. On *Duty Status Exams* completed in December 1996 and January 1997, Dr. Narcisi reported no work restrictions based upon Portis' condition. *Id.* at 22-23. On March 13, 1998, Dr. Narcisi noted that he informed Portis that she would likely "always have difficulty with her feet/ankles if she is on them too long." *Id.* at 4. In an April 3, 1998 letter, Dr. Narcisi noted that Portis's symptoms are exacerbated by increased activity and requested that she not be required to "stand for more than 5 or 10 minutes at a time." *Id.* at 20.

In the August 3, 1998 *Medical Impairment Evaluation*, Dr. Narcisi reported that Portis has a medically ascertainable impairment or condition that has lasted for a continuous period of at least 12 months. *Id.* at 15-19.  Specifically, Dr. Narcisi reported that the chronic inflammation of Portis' feet and ankles that began in November 1996 was of moderate severity, had lasted for 20 months, and was disabling. *Id.* at 15.  Dr. Narcisi reported that Portis' condition prevented her from being able to perform her previous job or other similar work and that performance of such work would adversely affect Portis' impairment. *Id.* at 16.  In particular, Dr. Narcisi opined that prolonged standing or walking will increase Portis' symptoms. *Id.*  Dr. Narcisi reported that Portis followed the treatment program that he recommended and that her condition had improved between November 1996 and his completion of the *Medical Impairment Evaluation*. *Id.* at 18.  However, based upon her foot structure, Dr. Narcisi's prognosis was that Portis would likely always have symptoms with any increased activity. *Id.*  Additionally, Dr. Narcisi reported that Portis' severe bilateral Pes Planus provided medically demonstrable evidence supporting Portis' description of her symptoms. *Id.* at 18-19.

Portis also reported on her *Claimant's Recent Medical Treatment* and stated in the hearing that she received treatment from Dr. Edward Kawecki.  (R. at 153, 224.)  In reference to Dr. Kawecki, the ALJ stated in the hearing, "we'll make a request and...see if we can get the records from...him."  (R. at 224.)  The ALJ reports in his decision that he requested post-hearing records from two sources but not from Dr. Kawecki (R. at 17), and no records from Dr. Kawecki appear in the record compiled by the ALJ.  In her Memorandum, Portis reports that she "did not obtain Dr. Kawecki's records because she had limited time to get her records for this appeal." (Pl.'s Mem. at 12.)  The record does include a 1997 evaluation and 1998 letter written by Dr. Kawecki, to which neither the ALJ nor the parties on appeal refer.  (R. at 175-182.)  The letter

from Dr. Kawecki is dated January 6, 1998 and requests that Portis "not be given an occupational assignment that would involve her standing." (R. at 175.)

### 2.  *The Community Hospital Records*

Following a fall on July 28, 2004, Portis was treated in the Community Hospital emergency room for contusions of the right hip, bilateral ankle pain, and strain of the cervical/lumbar spine. (R. at 136.) The records from Community Hospital were not made part of the record in this case, but Portis submitted them in the appendix to her Complaint. (Pl.'s Mem. App. at 26-36.) The Community Hospital records include x-rays of Portis' spine, knees, and right hip. *Id.* The x-rays of Portis' spine showed no fracture or dislocation but revealed mild degenerative changes in the mid and lower thoracic spine, L3-L4 and L4-L5, with mild osteophytes and mild degenerative changes in the facet joints of the lower lumbar spine. (*Id.* at 32, 35.) X-rays of Portis' right knee showed a moderate degree of degenerative changes in the medial and patellofemoral compartments with osteophytes, mild joint effusion, and calcification in the quadriceps and patellar tendons but no fracture or dislocation. (*Id.* at 33.) X-rays of Portis' left knee also showed no fracture or dislocation and revealed moderate degenerative changes and calcification in the quadriceps tendon. (*Id.* at 34.)

## II.  DISCUSSION

A claimant may waive her statutory right to counsel at a disability hearing, but she must be properly informed of the right before she can validly waive it.  *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (*citing Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir.1991)); *see* 42 U.S.C. § 406, 20 C.F.R. 404.1700 (providing for a claimant's right to counsel at a disability hearing).  To ensure a valid waiver of counsel, the ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees.  *Binion*, 13 F.3d at 245.  Portis argues (and the SSA concedes) that the ALJ did not satisfy the *Binion* requirements and therefore Portis' waiver of her right to counsel was invalid.  *See* Def.'s Mem. Supp. at 8 ("the ALJ did not fully comply with the requirements of *Binion*...and that Plaintiff's waiver of counsel was therefore not valid under the requirements set forth by the Seventh Circuit.")  The Court agrees with the parties and finds the waiver of counsel to be invalid.

However, an invalid waiver of counsel, by itself, does not trigger remand.  A claimant whose waiver of counsel was invalid is entitled to remand only if the ALJ failed his basic obligation to develop a fair and full record.  *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981) (failure to develop a full and fair record "has been consistently held to constitute good cause sufficient to remand . . . for the taking of additional evidence") (citations omitted); *Smith v. Sec'y of Health, Education, & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978).  To add teeth to the requirement that the ALJ adequately explain the right to counsel, the Seventh Circuit held in *Binion* that "if the ALJ does not obtain a valid waiver (of counsel), the burden is on the [SSA] to show the ALJ adequately developed the record."  *Binion*, 13 F.3d at 245.

Where as here the claimant proceeds without counsel, the ALJ meets his duty to develop the record fully and fairly if he "probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Binion*, 13 F.3d at 245. The duty requires the ALJ "scrupulously and conscientiously to probe into, inquire of, and explore for all the relevant facts." *Smith v. Secretary*, 587 F.2d at 860 (internal quotations omitted). The ALJ acts "as an examiner who thoroughly develops the facts" and his special duty "requires, essentially, a record which shows that the claimant was not prejudiced by lack of counsel." *Thompson*, 933 F.2d at 586 (quotations omitted). How much evidence is necessary to make a finding about disability "is a subject on which district courts must respect the [SSA]'s reasoned judgment." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993); *see also Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). "A significant omission is usually required before this court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly." *Luna,* 22 F.3d 687 at 692. "In other words, the omission must be prejudicial." *Nelson v. Apfel*, 131 F.3d 1228, 1235-36 (7th Cir. 1997). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion,* 13 F.3d at 246 (citing *Granger v. Finch*, 425 F.2d 206, 208-09 (7th Cir.1970), *cert. denied*, 400 U.S. 824(1970)).

Portis argues that the ALJ failed to develop a full and fair record. Specifically, Portis claims the ALJ: (1) failed to obtain medical records pertinent to her claim; (2) did not enter into the record "critical" documents that were allegedly part of Portis' hearing file; and (3) failed to elicit from Portis information about her subjective symptoms. (Pl.'s Mem. at 8-12.)

The Court finds that the ALJ, after failing to obtain from Portis a valid waiver of counsel, did not develop the record fully and fairly. The ALJ repeatedly stated in the hearing that he would obtain additional medical records in order to understand Portis' situation. But the ALJ never followed through on his assertion. In addition, the ALJ failed to request records from Dr.

Narcisi who, although never discussed in the hearing, is listed in the record as a treating physician. Had the ALJ obtained all of the medical records, the court would be in a better position to find that the ALJ's examination of Portis was adequate. Since the ALJ failed to obtain and consider the information that he claimed was lacking, his examination of Portis was incomplete.

The Court further finds that the additional evidence submitted by Portis to this Court, and made accessible to the ALJ via contact information in the record, constitutes a significant, prejudicial omission. Dr. Narcisi's records contain information that supports Portis' claim of disability and detracts from the evaluations by the Agency physicians. For example, Dr. Narcisi recommended that Portis not stand for more than 5 to 10 minutes at a time, suggested that any activity will increase her symptoms, found Portis' chronic inflammation of her feet/ankles to be disabling, and concluded that Portis' Pes Planus provides medically demonstrable evidence supporting Portis' claims about her symptoms.

The absence of the Community Hospital records also prejudiced Portis. For example, the records contain x-rays that reveal moderate degenerative joint disease ("DJD") in both of Portis' knees. (Pl.'s Mem. App. at 26-36.) The x-rays of Portis' hip showed no recent fracture or dislocation but revealed densities related to an old chip fracture or tendon calcification. *Id*. at 35. These conditions could further impair Portis' ability to stand and/or walk. Furthermore, the mere fact that the ALJ attempted to obtain the records (but mistakenly requested them from the wrong hospital) suggests that they were necessary even in the ALJ's mind in order to develop the record fully and fairly.

The Court is not in any way suggesting the amount of weight the ALJ should give this information. That is the ALJ's job, not this Court's. Rather, the Court is simply pointing out evidence that the ALJ should have made part of the record in order for it to be developed fully

and fairly.  Dr. Narcisi's records and the records from Community Hospital merited consideration by the ALJ.  Because the SSA has not met its burden to show that the ALJ developed the record fully and fairly, this case is remanded to the ALJ for further evaluation consistent with this opinion.

The Court is not persuaded by Portis' second and third arguments.  Portis' assertion that "over 80 percent of the information physically contained in the hearing filed was not actually part of the record" – absent a more concrete showing of the allegedly omitted evidence – is speculative and unconvincing.  Upon remand, Portis should have access to the same "physical hearing file" that she was shown before the September 2004 hearing and, to the extent she believes that documents were omitted from the record, she can identify those documents with specificity.

The Court also rejects Portis' argument that the ALJ "cut her off" several times at the hearing and failed to elicit sufficient information about her subjective symptoms.  This argument is a trifle.  For the system to run efficiently, an ALJ must have some discretion at the administrative hearing to re-focus the claimant on certain topics to the extent the claimant gets off track.  While Portis has identified certain follow-up questions that the ALJ could have asked, the same could be said about nearly any examination in any proceeding.  Taking the ALJ's questioning as a whole, the Court does not find it to be so lacking to have prejudiced Portis.

## III.  CONCLUSION

For the foregoing reasons, this case is remanded to the SSA for further gathering and consideration of evidence in a manner consistent with this opinion.

**SO ORDERED.**

Dated:  September 29, 2006

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
